UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
GILDA G SMITH

                     Plaintiff,            07-CV-6267T

          v.                        **DECISION**
                                      **and ORDER**
MICHAEL J. ASTRUE[1], Commissioner
of Social Security

                    Defendant.
_____

## <u>INTRODUCTION</u>

Plaintiff Gilda G. Smith ("Plaintiff") brings this action pursuant to the Social Security Act § 216(I), § 223, and 1614(a)(3)(A) seeking review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") payments and Disability Insurance Benefits ("DIB"). Specifically, Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") James E. Dombeck denying her application for benefits was not supported by substantial evidence contained in the record and was contrary to applicable legal standards.

The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, on grounds that the ALJ's decision was supported by substantial evidence.

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25 (d) (1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for his predecessor Commissioner JoAnne B. Barnhart as the proper defendant in this suit.

Plaintiff opposes the Commissioner's motion, and cross-moves for judgment on the pleadings, on grounds that the Commissioner's decision was erroneous.  For the reasons set forth below, the court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable law.  I therefore grant the Commissioner's motion for judgment on the pleadings, and deny plaintiff's cross-motion for judgement on the pleadings.

## BACKGROUND

On October 17, 2003, Plaintiff, at that time 49 years-old, filed applications for SSI Benefits and DIB under Title II, § 216(I), § 223(d), and § 1614(a)(3)(A) of the Social Security Act claiming an inability to work since May 25, 2003, due to: back strain, hypertension, hammertoe deformity, and mild urinary incontinence.  Plaintiff's application was denied by the Social Security Administration ("the Administration") initially on January 26, 2004.  Claimant filed a timely written request for a hearing on March 29, 2004.

Thereafter, on December 7, 2006, Plaintiff appeared with counsel in Rochester, New York, before the ALJ.  In a decision dated January 24, 2007, the ALJ determined that Plaintiff was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Social Security Appeals Council denied

Plaintiff's request for review on February 16, 2007.  On May 25, 2007, the Plaintiff filed this action *pro se*.

## DISCUSSION

### I.   Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.  Substantial evidence is defined as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 217 (1938).  Section 405(g) thus limits the Court's scope of review to determining whether or not the Commissioner's findings were supported by substantial evidence. See, Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that a reviewing Court does not try a benefits case de novo).  The Court is also authorized to review the legal standards employed by the Commissioner in evaluating Plaintiff's claim.

The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F. Supp. 265, 267 (S.D. Tex. 1983) (citation omitted).  The Commissioner asserts that his decision was

reasonable and is supported by the evidence in the record, and moves for judgment on the pleadings pursuant to Rule 12(c).

Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639 (2d Cir. 1988).  If, after a review of the pleadings, the Court is convinced that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief, judgment on the pleadings may be appropriate. See <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

**II.  The Commissioner's decision to deny the Plaintiff benefits is supported by substantial evidence in the record.**

    **A.  The ALJ's decision.**

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  The ALJ adhered to the Social Security Administration's five-step sequential evaluation analysis in determining disability benefits.  See 20 C.F.R. § 404.1520. Pursuant to the five-step analysis, the ALJ first considers whether claimant is currently engaged in substantial gainful activity. <u>Id</u>. If the claimant is not engaged in such activity, the ALJ considers whether the claimant has a severe impairment or impairments which significantly limit his physical or mental ability to do basic work activities. <u>Id</u>.  If the claimant suffers from an impairment that is listed in the Appendix 1 of Subpart P of the Social Security

4

Regulations, the claimant will be considered disabled without considering other factors. Id. If the claimant does not have an impairment listed in Appendix 1, the ALJ must then determine whether or not the claimant, despite his impairments, retains the residual functional capacity to perform his past work. Id. If the ALJ determines that the claimant is unable to perform his past work, the ALJ must then determine whether or not the claimant can perform other work in the local or national economy. Id.

Under Step 1 of the process, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since her alleged disability onset date. (Transcript of Administrative Proceedings at page 13) (hereinafter "T."). At Steps 2 and 3, the ALJ concluded that Plaintiff's impairments of back strain, hypertension, hammertoe deformity, and mild urinary incontinence, were impairments that were "severe" within the meaning of the Regulations but were not severe enough to meet or equal, either singly or in combination, any of the impairments listed in Appendix 1, Subpart P of Social Security Regulations. (T. at 15).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity to perform the exertional requirements of medium work, and therefore, the ALJ did not have to proceed to Step 5. Id. The ALJ found that Plaintiff's residual functional capacity to perform her previous work was not diminished, and that Plaintiff could return to her past relevant work as a nurse's aide

5

or security guard Id.  The ALJ further found that no treating or examining physician reported or opined that Plaintiff was disabled or had any physical limitations. (T. at 16).  According to the ALJ, there is no evidence of any impairment that would preclude Plaintiff, for a period of 12 consecutive months, from engaging in substantial gainful activity. Id.

**B.   The ALJ properly evaluated the medical opinions in the record.**

The ALJ properly relied upon substantial objective medical evidence as well as Plaintiff's subjective complaints, in weighing the opinions of Plaintiff's physicians.  The AJL primarily relied upon the opinions of Drs. Shamsie and Santana, Plaintiff's treating physicians, and afforded little weight to the opinion of Plaintiff's other treating physician, Dr. Kurian.  The ALJ also considered the opinions of treating podiatrists, Drs. High and Bonavilla.

The Social Security regulations require that a treating physician's opinion will be controlling if it is, "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). In addition, the weight to be assigned to the treating physician's opinion depends upon the length of the treating relationship, as well as the frequency of treatment. 20 C.F.R. § 416.927(d)(2)(I), § 416.1527(d)(2)(I).  The Plaintiff had multiple no shows and

cancellations for appointments with both Dr. Shamsie and Dr. Santana. (T. at 14). However, the ALJ still considered the doctors' opinions in his decision. <u>Id</u>. Further, the Plaintiff was only treated once by her new treating physician, Dr. Kurian, and therefore, the ALJ did not consider Dr. Kurian's opinion. <u>Id</u>.

Dr. Santana saw Plaintiff on January 7, 2002. (T. at 159). Plaintiff complained of a chronic cough, although she continued to smoke. She also complained of pain and calluses over her heels. <u>Id</u>. Dr. Santana's impression was: foot calluses, chronic tobacco use, chronic bronchitis, urine incontinence and hypertension (first episode). <u>Id</u>. Dr. Santana planned to recheck Plaintiff's blood pressure in a month, and in the meantime advised Plaintiff to decrease her salt intake. <u>Id</u>. Plaintiff subsequently missed two appointments with Dr. Santana on February 18, 2002, and on March 20, 2002. (T. at 158, 162). Thereafter, Plaintiff cancelled her appointment on May 21, 2002, and missed another appointment on May 28, 2002. (T. at 158).

Plaintiff finally showed up for an appointment on June 11, 2002. (T. at 156-157). Dr. Santana noted that Plaintiff's blood pressure was 140/90. (T. at 156). Plaintiff's urine incontinence was controlled by medication (Detrol). <u>Id</u>. Plaintiff complained of right shoulder pain, but upon examination, she had no significant tenderness, and had full range of motion for that shoulder. <u>Id</u>. Dr. Santana prescribed Plaintiff medication for her shoulder pain,

advised Plaintiff to use hot compresses, to attend physical therapy, and to take Advil. Id. During this time, Plaintiff was scheduled to have foot surgery for her calluses on June 26, 2002. Id. Plaintiff missed two other appointments on August 16, 2002, and September 20, 2002. (T. at 161). Plaintiff did show up for her appointment on November 7, 2002, to have a PPD (purified protein derivative) test for her job physical. (T. at 155). Dr. Santana opined that Plaintiff's blood pressure of 150/80 showed that she was non-compliant with taking her medication, and advised Plaintiff to take her medication on a regular basis. Id. Notably, on July 18, 2003, Plaintiff called Dr. Santana's office stating that she needed a statement saying that she had a slipped disc. (T. at 160). An office note indicated that Plaintiff was told that she needed to be seen, however she missed her appointment that day, and a "no show" card was sent to her. Id.

Plaintiff was first seen by Dr. Shamsie on October 14, 2003. (T. at 153). Plaintiff was reported by Dr. Shamsie to be a non-compliant patient who had missed several appointments, smoked cigarettes and marijuana, complained of pain in her left shoulder, and had a history of an overactive bladder. Id. During the physical exam performed by Dr. Shamsie, Plaintiff's blood pressure was 130/70. Id. Plaintiff complained of left shoulder pain on motion and limited abduction. Id. Dr. Shamsie assessed a sprain, tendonitis/bursitis of the left shoulder in the deltoid area, and

prescribed Naproxyn and shoulder exercises. Id. Dr. Shamsie referred Plaintiff to a podiatrist for her foot calluses and encouraged Plaintiff to abstain from smoking and using marijuana. Id.

Plaintiff cancelled her following appointment with Dr. Shamsie scheduled for November 20, 2003. (T. at 169). On December 16, 2003, Plaintiff appeared for a scheduled appointment and stated that she was treated at Unity Hospital/Evelyn Brandon, located in Rochester, New York, for substance abuse of cocaine and depression. (T. at 169, 213). Dr. Shamsie noted that Plaintiff's lungs were clear, her blood pressure was 130/80, and that her right elbow was tender. (T. at 168). Dr. Shamsie recommended that Plaintiff have an x-ray taken of her right elbow to rule out a fracture, and to continue with Naproxyn. Plaintiff's hypertension was noted to be under control. Plaintiff was told to return in one week, but cancelled her appointment on December 29, and did not show up for appointments on December 31, 2003, March 9, 2004, and April 1, 2004. Id. Plaintiff showed up one hour late on April 27, 2004, and was told that she would have to reschedule her appointment. Id. On May 4, 2004, Plaintiff kept her appointment with Dr. Shamsie and stated that although she did not have health insurance, Plaintiff was still able to obtain her medications. (T. at 166). Plaintiff once again did not show up for her appointment on July 1, 2004, and did not show up until January 19, 2005. (T. at 164-165).

9

Thereafter, Plaintiff again cancelled her appointment on February 7, 2005, and did not show up for her appointment on April 27, 2005. (T. at 180, 178).  Plaintiff was seen by a physician's assistant on June 24, 2005, and on August 11, 2005, for back pain. (T. at 176-177).

Dr. Santana saw Plaintiff on September 20, 2005 for recurrence of back pain for the previous three days. (T. at 173).  Plaintiff's blood pressure at that time was 108/74, and she had clear lungs. Dr. Santana recommended physical therapy, and also offered Plaintiff chiropractic services. Dr. Santana also suggested that Plaintiff take Wellbutrin for smoke cessation, which he prescribed for her over the previous year.  Plaintiff had listed Wellbutrin as one of the medications even though she had not started taking it. Id.

Dr. High, a podiatrist, saw Plaintiff on October 24, 2005, for the first time complaining of pain "24/7." (T. at 182-184). Dr. High noted that Plaintiff had painful fibrocutaneous plantar lesions and found that Plaintiff had ingrown, dystrophic, mycotic toenails, fissured plantar skin and onychomycosis. Dr. High debrided the hyperkeratoic lesions and reduced Plaintiff's toenails. He stated that Plaintiff would be considered for treatment with Lamisil, and  recommended laser treatment on the lesions. (T. at 183-184).  Dr. High also contacted Dr. Santana on November 16, 2005, to inform him  that Plaintiff was scheduled for

outpatient ambulatory bilateral laser ablasion surgery to take place on November 23, 2005. (T. at 181).

In June 2006, Dr. Kurian, Plaintiff's latest treating physician, advised Plaintiff to undergo a bone density test. (T. at 189). According tp the medical record, Dr. Kurian only saw Plaintiff on one occasion, and did not provide any treatment or prescribe any medications. (T. at 220).

On November 7, 2006, podiatrist Dr. Bonavilla reported that Plaintiff was complaining of pain and irritation of the second right toe, and development of a painful growth under the sulcus area of the second right toe. (T. at 185). Plaintiff also said that her left foot also has been painful since surgery. During examination of the Plaintiff, Dr. Bonavilla found Plaintiff's pedal pulses to be equal and presently bilateral. Dr. Bonavilla noted on the left foot: a deviation of the second toe, and a plantar lesion on the 5th met head area and under the great toes. The recommended treatment from Dr. Bonavilla included orthotic control with dispersion padding to accommodate for plantar lesions and correction of hammertoe, and right bunionectomy. Plaintiff was also casted for orthotics, and Dr. Bonavilla asked to see Plaintiff when the orthotics returned from the lab. Id.

## C. **The ALJ properly evaluated Plaintiff's subjective complaints.**

The ALJ based his decision on the medical evidence, testimony, and observations of the Plaintiff. (T. at 16). Since no treating

physician reported or opined a disability or an impairment that would preclude Plaintiff from working for 12 consecutive months, the ALJ properly found that Plaintiff is not disabled as defined by the Social Security Act.

For Plaintiff to be entitled to disability benefits, she must have a medically determinable impairment that is expected to result in death or last for a continuous period of time greater than twelve months, limiting her functional ability to do her past relevant work or other work that exists in the national economy. See 42 U.S.C. §§ 423(d) and 1382c(a)(3). With respect to Plaintiff's ailments, the ALJ determined that Plaintiff retains the residual functional capacity to do her past work as a nurse's aide and security guard which are both positions that require medium work level. (T. at 15).

Plaintiff testified that her hypertension, urinary incontinence, and foot impairments kept her from being able to work. (T. at 15). However, Plaintiff's own doctor noted during a physical exam that Plaintiff's hypertension and urinary incontinence were controlled by medication. (T. at 173, 156). As to her complaints of foot pain, Plaintiff received treatment from podiatrists Dr. High and Dr. Bonavilla, and had a follow-up appointment with Dr. Bonavilla for orthotics. (T. at 212).

I find that the ALJ correctly considered all of Plaintiff's physical as well as mental limitations in assessing her residual

functional capacity.  The ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record.

### CONCLUSION

For the reasons set forth above, I grant the Commissioner's motion for judgment on the pleadings.  Plaintiff's motion for judgment on the pleadings is denied, and Plaintiff's complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**


_____    s/Michael A. Telesca_____
                                        MICHAEL A. TELESCA
                                    United States District Judge

Dated:    Rochester, New York
          July 8, 2008

13